UNITED STATES *v.* SAMUEL SHAPIRO & Co. (No. 3330)[1]

T. D. 44374.

United States Court of Customs and Patent Appeals, November 3, 1930

*Charles D. Lawrence*, Assistant Attorney General (*James R. Ryan*, special attorney, of counsel), for the United States.
*Comstock & Washburn* (*J. Stuart Tompkins* of counsel) for appellee.

[Oral argument October 13, 1930, by Mr. Lawrence and Mr. Tompkins]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

GARRETT, Judge, delivered the opinion of the court:

The merchandise herein involved apparently consists of parts of two machines referred to on one of the invoices as "Jute Twine Manufacturing Machinery." One of the shipments was invoiced as a "down-striker shell breaker cord, 4 feet by 6 feet, cylinder, one doffer, two pairs of rollers, complete with covering, pulleys on left hand when facing feed table"; the other as a "full-circular finished cord, 4 feet by 6 feet, cylinder, one doffer, three pairs of rollers, complete with covering, left-hand drive." The appraiser in his answer to the protest describes the shipment as consisting of "certain machine parts used in the preparation of fibers" and adds:

The twines or threads thus made are in the opinion of this office susceptible of being woven, and hence the classification of the merchandise as textile machinery 35 per centum, Par. 372.

The collector in his report states that the classification "as textile machinery is correct."

The importer made protest, claiming the merchandise to be dutiable under the provision for "all other machines or parts thereof," or "machine tools and parts of machine tools" at only 30 per centum ad valorem under paragraph 372. There were alternative claims of 10 per centum or 20 per centum under paragraph 1459, but these are not here insisted upon and will not be further considered.

The Government here insists that there is no substantial evidence to sustain the judgment below upholding the protest. This renders it necessary for us to review the testimony.

But one witness was called, Mr. Roy C. J. Emmet. He was called by the importer.

Mr. Emmet appears to have been connected with the Hanover Cordage Co. (on whose account the merchandise at issue was purchased) for 15 years at the time of taking his testimony in April, 1929, and was then its secretary-superintendent. The company is a manufacturer of twines and cords. For the seven years prior to April 19,

1929, his duties were "to purchase machinery, raw fibers, incidental supervision over the plant." He identified illustrative Exhibits 1 and 2 as being photographs of the machines involved and Exhibits 3, 4, 5, and 6 as being samples of the products of the respective machines.

It appears from his testimony that in the manufacture of his company's twines and cords, Mexican istle and jute fibers are used in about equal quantities, "about 50 per cent of each"; that the machines, parts of which are involved, do not produce the completed twine or cord, but merely process the raw material to the stage as illustrated by the Exhibits 3, 4, 5, and 6; from this stage it, by a further process of manufacture on different machines, is made into the size twine or cord desired; the twines and cords are the final product of his company.

Describing the processes upon the respective machines, whose parts are at issue, the witness explains that the raw material is placed upon a feed table of the shell breaker machine (illustrated by Exhibit 1), passes through it, and comes out "in a sort of workable condition, softened, straightened out"; that the material then is passed through the second device (illustrated by Exhibit 2) and brought "into a more finished condition." The parts of the machinery which bring the raw material to this stage are the parts here involved.

In this condition the material goes into a third device called draw frames which "bring it down to a finer workable condition"; it is then "in a sort of strand form," and it then goes to "another set of machines which complete the rope or cord by "twisting or 'laying.'"

No question is made by the Government as to the accuracy of Mr. Emmet's testimony relative to the use of these machines, or relative to the products made by them in the twine and cord factory, but the insistence is that he was not qualified by experience to prove that the "product as it comes from those machines" could not be utilized in the manufacture of jute cloth; that he could not tell from his own knowledge whether they were "in use in textile plants that manufacture jute cloth" and that importer had therefore failed to negative the presumption of correctness attaching to the collector's classification.

We quote in full such testimony of the witness as was admitted by the judge before whom it was taken which bears upon this phase of the issue.

Q. Do you have anything to do with weaving products?—A. No.

Q. Are these commodities which you handle in your business and manufacture exclusively used in the cordage industry?—A. For making jute, making twines and cord.

Q. Do you know any other uses for commodities like illustrative Exhibits 3, 4, 5, and 6 other than those used in the cordage industry?—A. No.

Q. What is the basis of your knowledge about the weight of the strands used in your machines?—A. All twines are manufactured on a weight basis.

Q. Have you also observed the material that is used in weaving and textile factories?—A. Yes.

Q. Please state just what your observations have been.—A. I have seen them in textile mills. I have been through them and seen the materials that are used.

Q. Have you also read up on that subject, on the materials as used in the textile mills and cordage industry?—A. Yes, sir.

Q. Have you ever known or seen materials of the weight or coarseness of any of these exhibits used in textile mills?—A. No.

## Upon cross-examination:

Q. You were never employed in a textile mill?—A. No; only have been there.

Q. Just on occasional visits?—A. Yes.

Q. Not with any great frequency or great duration of time?—A. Not any great duration of time. Possibly a day. Well, about once in six months I would be safe to say.

Q. Are you familiar with jute cloth?—A. Some kinds of it.

Q. And the various weights?—A. Yes.

Q. You can not tell from your own experience whether or not a machine like those represented by the illustrative exhibits and covered by these importations could be used in preparing jute for the heavier jute cloths?—A. I don't believe they could.

Q. Do you know of your own experience?—A. No; I do not.

Q. You have never tried to use the product of either of your machines in the manufacture of jute cloth?—A. No. In fact, we have to buy that. We have to buy it for our own covering purposes.

Q. You do not manufacture at all?—A. We can not manufacture.

Q. Is the condition represented by illustrative Exhibits No. 4 and No. 5 the only condition in which those machines will turn out jute and istle?—A. Yes, sir.

Q. Can you make it any finer or any coarser?—A. Not on those machines.

Q. Do you know from your own experience whether the product as it comes from those machines can be utilized in the manufacture of jute cloth?—A. Not that type of machine.

Q. I am asking you based upon your experience do you know?—A. No.

Q. Then, in so far as you have had experience with machines like those under consideration here, it has been the use of them in your cordage plant?—A. Yes, sir.

Q. You can not tell of your own knowledge whether they were in use in textile plants that manufacture jute cloth?—A. I have never seen them there.

Q. That is the extent of your knowledge on that point?—A. Yes, sir.

Q. Are you familiar with the term "Hessian yarns"?—A. Hessian yarns—the only thing I know of it, I know there is a burlap sold.

Q. These machines will produce Hessian yarn? Will use Hessian yarns?—A. I don't believe they will. I am not familiar with them enough.

Q. I call your attention to this notation on "illustrative Exhibit No. 2," "cylinder 4 feet diameter, 6 feet wide, etc. * * * With this special arrangement the jute does not receive such harsh treatment as with a shell feeder." Now, in view of your experience in using those machines, would that indicate to you that that machine could be used to treat Hessian yarns?—A. I don't know.

Q. Hessian yarn is a burlap material?—A. I presume it is.

Q. Burlap is a textile?—A. It is.

Q. If the machine represented by illustrative Exhibit No. 2 could be used for the preparation of Hessian yarns or treating them, the machine represented by illustrative Exhibit No. 1 would do likewise?—A. I would presume so.

On redirect examination:

Q. Why do you say that you do not believe that these machines will operate on yarn or serve to make materials used in yarns?—A. Because it requires a finer class of work for yarn. In other words, you have to have material manufactured and brought down that would be capable of laying up in 8 or 10-pound weights.

On recross-examination:

Q. You have had no experience in using these machines in the textile industry?—A. No.

Q. Or any other machine in the textile industry?—A. No.

Q. Then, any information that you expressed as to the unfitness or fitness of this machine was not based on any actual experience?—A. No more than just seeing; that is all.

Q. You commented on illustrative Exhibit No. 2 that the machine could be used for the treating of Hessian yarns?—A. I don't know. It is printed thereon.

Q. You have seen that before?—A. Yes.

In the light of the evidence we would not feel justified in holding the Customs Court to have been in error upon its finding that—

The uncontradicted testimony of plaintiff's witness fairly establishes that the machines involved herein are exclusively employed in the manufacture of twines and cord.

Certainly the specific machines imported are shown to have been so exclusively used beyond any question of doubt, and we feel that the importer has succeeded in establishing at least a *prima facie* showing in this case which is sufficient to overcome the presumption of correctness of the collector's classification, and to shift the burden of proof from the importer to the Government.

The witness, Emmet, it is quite true, did not qualify as one having personal working experience in textile manufacture or with textile machines, but he did qualify as one having knowledge of the materials involved. His business was that of working with istle and jute—a somewhat technical business. It would seem that in the very nature of things he would acquire some knowledge of the general uses of these materials. He visited textile mills and observed their workings as often as twice a year, spending a day at a time in his observations. He had also read works upon materials as used in the textile mills and cordage industry. An intelligent man, such as he appears to be, familiar with the materials, could hardly fail to observe their use or nonuse in the textile mills he visited. His negative testimony, even though it can not be classed as that of an expert in textiles, was, we think, sufficient, when taken with his positive statements as to his personal knowledge and use of the involved machines, to make a *prima facie* case which it was the business of the Government to rebut, if rebuttable. This the Government made no offer to do until its application for rehearing was, as we have held, properly denied because of the virtually-admitted insufficiency of the affidavit tendered in support of it.

It is true that the Government makes an insistence that the machines may be used to prepare material for what is termed "Hessian yarns," and cites certain descriptive matter contained in Exhibit 2 as to the "full circular finished cord," which reads:

With cylinder 4 feet diameter, 6 feet wide, and for ordinary Hessian yarns has four pairs of workers and strippers, one plain feeder; one pinned feeder, one feeder stripper and one doffer, with one delivery at the side of Card. With this special feed.arrangement the Jute does not receive such harsh treatment as with the shell feeder.

The brief then quotes from the testimony where the witness says that he "*presumes*" Hessian yarn is a burlap material, and that burlap is a textile. (Italics ours.)

This contention of appellant is only applied directly, as we understand it, to one machine, viz, Exhibit 2.

In view of the positive testimony of the witness as to the products for which his company uses the machines, we think it would be unduly straining the meager.testimony about Hessian yarn contained in this record to hold it sufficient to overcome the protestant's *prima facie* showing.

In the case of *Morse Bros.* v. *United States*, 13 Ct. Cust. Appls. 553, 562, T. D. 41432, this court, speaking through Judge Bland, said:

* * * We do not know what method of determining the staple the collector used—if any at all—but if the importers had introduced no testimony, the presumption of the correctness of the collector's finding would not have been overcome and would have been conclusive, under the circumstances of this case. The importers having assumed the burden of overcoming the presumption and having introduced testimony making a *prima facie* case controverting the presumed facts, then the presumption attaching to the collector's finding falls. Then, if the evidence supporting the importers' contention outweighs the evidence supporting the collector's position, the importers are entitled to a decision in their favor. In weighing the evidence, the presumption of correctness attaching to the finding of the collector is not to be regarded as having evidential value, and can not be weighed against the evidence of the party challenging the correctness of his finding. *United States* v. *Edson Keith & Co.*, 5 Ct. Cust. Appls. 82; *United States* v. *Bloomingdale Bros. & Co.*, 10 Ct. Cust. Appls. 149.

The Government insists quite earnestly that the instant case is controlled by this court's decision in *Whitlock Cordage Co.* v. *United States*, 13 Ct. Cust. Appls. 656, T. D. 41490.

In that case the court, speaking through Judge Hatfield, held (we quote the syllabus) that:

Machines which manufacture textile fibers into yarns for making ropes are classifiable as "all other textile machinery" under paragraph 372, Tariff Act of 1922. * * *

The distinction between that case and the instant one is found, we think, in the different findings of fact in the respective causes.

In the *Whitlock* case this court said:

There is *nothing in the record* to indicate that the yarn made by this machinery is not suitable for weaving, and from an examination of the exhibit in the case, we think it is suitable for such purposes. It is, therefore, textile material. [Italics ours.]

There, as here, the collector had made a classification to which the presumption of correctness applied, but there no testimony was presented which overcame the presumption. Here we have held the importer to have succeeded in *prima facie* meeting the burden of overcoming the presumptive correctness of the classification made.

It is true that the court said in the *Whitlock* case, *supra:*

Obviously, the provision was not intended to be limited in its operation to textile machinery of any particular kind, or to that which produced woven fabrics. It was intended, we think, to be sufficiently comprehensive to cover *all* textile machinery not otherwise specially provided for, and certainly includes machines which are used in the manufacture of textile materials.

A careful study of the opinion, however, clearly indicates that the quoted language was used solely because of the contention made there by appellant and stated in the opinion:

* * * that it was intended by the Congress to include within the provision for "all other textile machinery or parts thereof" only such machinery as *produced fabrics.* [Italics quoted.]

It is not deemed necessary here to pass upon the question of the applicability or nonapplicability of the principle applied in the case of *Passaic Worsted Co. et al.* v. *United States,* 17 C. C. P. A. (Customs) 459, T. D. 43916.

Based solely upon the findings of fact in the case at bar, all the appellant's assignments of error are overruled and the judgment of the Customs Court is *affirmed.*